May it please the court, Mary Ann Dookin, son of Mr. Holland, and Fran Reynaga. We request silence for both, and will watch the clock. As you know, the lower court dismissed both of Mr. Reynaga's claims on summary judgment, the claims for racial impacts to the work environment, and the claims for wrongful termination. There is sufficient evidence to go to jury on both of these claims. On the termination claim, the question was disputed as to why Mr. Reynaga was terminated, and this court frequently noted issues of mental state regarding why someone is terminated in the work environment. I think it's actually subject to circumstances that have been imparted, and so it generally will go to jury questions as to the reasons for his termination. According to the court, Mr. Reynaga was terminated in the work environment, but he was terminated in the process. He was terminated at the perception of the employer, following on some of the words of Mr. Reynaga, and for termination he was terminated. Mr. Reynaga came in during the two years to show that the reason why Mr. Reynaga was terminated has been, of course, contextual. But it was the circumstances of the case that created the situation of the case, and that was the determination of Mr. Reynaga in the process. A reasonable jury could believe that because that action came after the termination of his complaint, and because he worked at the top of the hierarchy, of course, that it was unreasonable for the employer to terminate him in the process of perpetuation of the hostile work environment in which his termination came before him. I think that it's important to go on and look at the literature to make sure that Mr. Reynaga was, of course, contextual. I think the jury thinks he was so outgrown in the process. I think it's a very reasonable jury could find that it was reasonable, and that it was a reasonable step to do that in light of his complaint that was still pending at the time. Mr. Reynaga, Mr. Reynaga, he actually agreed to this. This was decided on a summary judgment. Is that right? Yes, it is. Okay. So, in these cases, they're generally, almost universally heard by juries, and generally, it's supposed to be a summary judgment, as far as I understand it. So, what your client is complaining about is that he is less aware of the right connections between his girlfriend and his son, or his wife, Richard. Is that right? Yes. And they were the only two cases that were known to his family. So, it was very hard for him to learn. And that's part of the record. I believe, at one time, there was a black person. Okay. So, the only one case before Mr. Reynaga, he kept making references like this to your client. These are all in the record. He used to, he would refer to black people as leaders, as heirs. And then, Reynaga told Reynaga in September of 2009, after Reynaga received a bunch of tags for the second year in a row, I'm a true believer that we should close the borders and keep motherfuckers like you from coming up here and killing our own people. Do you say that to him? No. No. No. I don't believe that. I put an email in the break room that had an article by my boss, saying that legal issues and things like that are borders of my existence. Do you believe that? Yes. I don't think that was referenced. It was always referenced to a black person. There were two cases. There were two cases, also, specifically, and Mr. Reynaga's case was not aware of it. Apparently, he didn't realize why he would disagree with Reynaga and refer to Indian women as nasty black swans. Yes. Right? Right. They said that Reynaga and minorities are taken for granted. They referred to her as black, and it was over a period of time. And probably because Reynaga's first-time friends say that Reynaga was a big boy and a little tiny, and nobody can tell you how big he was. And they referred to him as Reynaga's wife. Yes. We're on this program as men. He just sticks around and just is. And what they were building, like, he called it a boy, you're a swan, a boy, you're a swan. And that went on. And, you know, it goes on for ages and ages and ages. And so we've got plenty of evidence in the record that what was being said to Mr. Reynaga by the brainer was just not some little, you know, Correct. The Supreme Court, after the appeal was filed, and then Justice Paul got rid of the concept of strict liability for superstitious reactions. But there would still be employer liability for failure to adequately respond, which is addressed in our group in pages, especially in page 16, Alston v. Brady, Dotson v. Bancroft. The action by the employer in response to the income of the company either must be sufficient to ensure or must be stopped. Talking about the hiring of businessmen, Mr. McFarland came in, I believe it was, in a week or so, and said, You've been overrun, you've overseen, you've encouraged people to speak to us. Because I said, I'm the boss here. This is me. This is not me. It's not too much. Do you have any stories about businessmen that you've had with some businessmen over the years? Well, first of all, that was only when Dr. DeMaine had written some texts in the shop store, in his job early. I've been notified of this story, that there was actually a long response to his verbal, that he had verbal complaints in September and October of 2011. But the written complaint in December of 2011, that he tried to hire some firms to do some interviews. But actually, there was no action taken against that either. There was, in fact, that's when they brought Mr. Brown back onto the ship for him to contact Mr. Brown again. And certainly, I think there's a jury question on whether that was an adequate response by the employer. The employer's management agreed that over time, that if there's a response, then they would just make requests of him to look at him to see if he was not doing what he was doing. And then, they also adopted the claim that that's not sufficient. So, this is a long argument. What do you want to make of that? So, about how the company dealt with the situation, you and I, you know, Jerry, maybe you've been to these fires before. I know you've been to these. That would be one of these jury questions that I think would have some better responses than this one, but these ones are going to be a little bit different. Yes, well, I think Mr. Brown, I think also, that he did have a really strong bond with the ship. So, it turned out that on one day, there were tons of times that he was there. So, actually, our client was just deciding, his declaration was, it's very common for these two ships to have to be, to keep each other in the same community because they're shared areas. Two ships. I think it's three. Yes, three ships. How many people were there? How many people were there? How many millwrights were there in this case? Millwrights, I believe, maybe 16 or 20, depending on the day of the month. How many millwrights were there? I don't know. I don't know. It wasn't a lot. There was, there was a lot. There was a lot of millwrights. He went back to his house, and he was wondering how come there was so few millwrights. Yes. Yes. Yes. I also want to note that this, I'm sorry, we do, we do have some authority, and we have cases where a majority, it's not, it's not a percentage, but the millwrights majority, it's been held, the company's been held by a, he called it a low-level employee. It was, well, he didn't have a low-level employee. He was considered to have, considered to be a, that's true. He wasn't, he wasn't, I don't know, supervising his teacher at all. I think he was a supervisor, yes. Yes. And that's, he took it as only a case, but now he doesn't know the employers automatically, and there's a silver lining. I think that's an open question in the Oregon State law. And, you know, again, he was with a long-standing partner, Mr. Hecht, who was the Swing Ship Production Supervisor, just sort of, he just grew up in Canada, and last spring, very honestly, he came and raised the students at ER 69. Right. What, what, do we know what, what his role as supervisor was? We talked, right now, with Cynthia, when, when, when he came to Oregon, the local convention, Mr. Westbrook, who was, Mr. Westbrook, Mr. Westbrook was the Master Attorney, who was our new superintendent. He, had high priorities. He took a vote at ER 127 to 28, and he was, and he said, he would just say, I hope you learn from your mistakes, and don't do it again. And he said yes. And he, we enjoyed Mr. Westbrook. Just a couple of sentences. Correct. Request that the court review all of the indictments, which is not the case. Thank you. Mr. Westbrook, do you have any further questions? I do have a couple of questions for Mr. Westbrook. The first one is, Mr. Westbrook, was it made at the local convention, or was it a person, or was it a member of the working class community, at the local convention? And, was there any sort of experience, or any sort of experience that has led to that experience, that has led to an inquiry from the management of the working class in the process? And, I guess, I mean, I'm not sure that's the case with Mr. Westbrook. This was the first notice to Mr. Forsbrooks, and I don't know if it's been brought to his attention or not. He only had a few letters related to the court in September. His last written letter to Mr. Forsbrooks was a complaint that he feared it was going to be a racist initiative. That's the entire record for Mr. Forsbrooks, but this was also a petition that was reported to us regarding racism in October of last year by a single student. The student's whereabouts prior to October 2009 were under separate investigation. Further, the individual Stuart Westbrook Burns testified that, indeed, and from what I've told you, it was not a racial issue in October 2009. I recognize that Mr. Westbrooks held a court in Moscow about that, and the only information in this record is the racist racist nature of the case. The only other piece of evidence we have is a verbal complaint verbally written from him. The background is primarily focused on the specific information used to make the complaint, which was not              The only other piece of evidence we have is the verbal complaint written from him. The only other piece of evidence we have is the verbal complaint  from him. The only other piece of evidence we have is the verbal complaint written in black paper The only other piece of evidence we have is the verbal complaint written in black paper written in black paper chap in chap in chap in in in chap in chap in in chap in in chap in chap in chap in in in chap in chap  chap in  in  in chap in in chap in chap in chap in chap in in in    in in in in in in this this this is is this is this is this this is this this this this this this is this this is this this this this is this is this is this this is this this this this this is this this thi is this is this       is   this is this is this is this is this is this is this is this is this is this is  is this  this is this is this is this is this is this is this is 汗 is and is now is R r r r r r r r r r r r r r r r r r r r r  f
judges: Pregerson, Bea, Owens